**S.A.R.L. Galerie Enrico NAVARRA and Enrico Navarra, Plaintiffs,**

v.

**MARLBOROUGH GALLERY, INC. Defendant.**

**No. 10 Cv. 7547(BSJ)(RLE).**

United States District Court, S.D. New York.

June 21, 2011.

Jeremy Landes Wallison, John Britton Payne, Foley & Lardner, LLP, New York, NY, Ariel Marie Fox, Foley & Lardner LLP, Washington, DC, for Plaintiff.

Harry W. Lipman, Rottenberg Lipman Rich, P.C., New York, NY, for Defendant.

*Memorandum and Order*

BARBARA S. JONES, District Judge.

Plaintiffs S.A.R.L. Galerie Enrico Navarra and Enrico Navarra (collectively "Navarra") filed suit contending that defendant Marlborough Gallery, Inc. ("Marlborough") engaged in a systematic campaign to unfairly eliminate all competition and thereby achieve monopoly power in the global market for the sale of ceramic artwork by the artist Chu Teh–Chun ("Chu"). Specifically, Navarra asserts 12 causes of action: (1) Attempted Monopolization under 15 U.S.C. § 2; (2) False Advertising and Trade Disparagement under 15 U.S.C. § 1125(a); (3) Common Law Defamation/Libel Per Se; (4) Common Law Product Disparagement/Injurious Falsehood; (5) Common Law Tortious Interference with Contract; (6) Common Law Conspiracy to Commit Tortious Interference with Contract; (7) Common Law Conspiracy to Commit Defamation/Libel Per Se; (8) Common Law Conspiracy to Commit Product Disparagement/Injurious Falsehood; (9) Common Law Aiding and Abetting Tortious Interference with Contract; (10) Common Law Aiding and Abetting Defamation/Libel Per Se; (11) Common Law Aiding and Abetting Product Disparagement/Injurious Falsehood; and (12) Common Law Unjust Enrichment.

Marlborough moves to dismiss the Complaint pursuant to Rules 8(a) and 12(b)(6) and for an award of Marlborough's attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## BACKGROUND [1]

The basic facts that underlie this action are not in dispute. The Navarra Gallery is a private, high-end art gallery run by Enrico Navarra. The Gallery maintains

---

1. The following facts are drawn from the Complaint, unless otherwise noted, and are assumed true for the purposes of this motion.

space in Europe and the United States where the Gallery and Navarra buy and sell art. Navarra characterizes the market for high-end art as small, specialized, and global. The market for high-end works of art also contains submarkets for works of art by particular artists and, within those submarkets, further submarkets for particular aspects of an individual artist's body of work.

Chu is a renowned, Paris-based artist who is primarily known for his work as a painter. Chu was born in China in 1920 and immigrated to Paris in the mid–1950s. Since his arrival in Paris, he achieved commercial and critical success as an artist—his work has been exhibited in over 100 solo shows and is a part of at least 25 museum collections.

Navarra began working with Chu in 1997, when they organized shows of Chu's paintings in Europe and Asia. In 2003, Navarra entered into a "Fabrication Agreement" with Chu and a ceramic foundry, La Tuilerie. Pursuant to the Agreement, Chu designed 24 plates, each with an original painting by Chu. Following Chu's final approval and the execution of a *bon-à-tirer*[2] for each plate, the plates were reproduced in multiples of 40 by La Tuilerie. 960 total plates were produced. The original 24 design templates were not to be sold by Navarra. The last *bon-à-tirer* was signed by Chu in August of 2004. Following the approval and production of the plates, Navarra published a catalogue and otherwise marketed the plates. The plates were exhibited in Europe and sold at auction for a minimum sales price $1,700 to $2,100 each. Navarra characterized their marketing and sale as a great artistic and commercial success.

In 2006, Marlborough began working with Chu, first showing his paintings at a gallery in New York. After that showing, Marlborough began to work with Chu on a series of ceramic vases. Each of the 57 vases commissioned by Marlborough was an original work of art, hand-painted by Chu. On January 31, 2007, fabrication began on the Marlborough-commissioned ceramic vases. Each vase was expected to retail for approximately $200,000. They subsequently fetched approximately $280,000 each on the market.

Navarra claims that the Navarra-commissioned plates were a barrier to the marketing and sale of the Marlborough-commissioned vases. Because of this, Navarra alleges that Marlborough engaged in a multi-stage covert campaign to destroy the goods, business, and reputation of Navarra, their market competitor.

Specifically, Navarra alleges that on February 29, 2007, Chu's attorney, Bourdon, sent a cease and desist letter to Navarra and La Tuilerie. The letter asserted that Navarra and La Tuilerie were violating certain provisions of the Chu–Navarra Fabrication Agreement. The letter demanded that the Fabrication Agreement be terminated, that Navarra-commissioned plates be returned to Chu, and that all exhibitions and sales of the ceramics be ceased. Navarra asserts, without citing to any factual support, that the cease and desist letter sent by Chu's attorney was actually written and sent at Marlborough's behest and with its participation and substantial assistance.

Upon receipt of the letter, Navarra did not agree to terminate the Fabrication Agreement or remove the Navarra-commissioned ceramics from the market. On April 10, 2007, Chu brought a lawsuit against Navarra and La Tuilerie in France. Chu sought the same relief re-

---

**2.** A *bon-à-tirer* is the artist's final approval of an exemplar of a work to be reproduced in multiples. The signing of a *bon-à-tirer* signals that the experimentation and creation process is over and reproduction may begin.

quested in the cease and desist letter. Navarra asserts, again without any factual support, that the French lawsuit was actually brought at Marlborough's behest and with its participation and substantial assistance. This lawsuit is still pending.

In May of 2008, Navarra attempted to publically auction a number of the Navarra-commissioned ceramics through Christie's in Hong Kong. The auction was scheduled for May 25, 2008. On May 16, Chu's attorney sent an e-mail to Christie's Hong Kong stating that the Navarra-commissioned ceramics were the subject of litigation in France and that Chu "has the greatest reservations about the authenticity" of the ceramics. The e-mail also demanded that the auction be cancelled. As a result of the allegations, Christie's Hong Kong backed out of its contract with Navarra and removed the works from its auction. Navarra asserts that these allegations were knowingly false and defamatory and that this e-mail was also actually written and sent at Marlborough's behest.

Navarra also claims that on October 3, 2008, Marlborough was behind an advertisement that appeared in the Journal des Arts. The advertisement was entitled "A Public Warning from Mr. Chu Teh–Chun." It warned that the Navarra-commissioned ceramics were not genuine and that the Christie's Hong Kong auction was cancelled. Navarra also claims that Marlborough "republished" the statements contained in the advertisement to other, unspecified media outlets around the world. On December 3, 2008, in response to the advertisement, Navarra sued the

Journal des Arts and Chu in France for defamation. Navarra did not sue Marlborough for defamation at that time. Navarra's suit against the Journal des Arts settled. The case against Chu is pending.

According to Navarra, the "final step" in Marlborough's campaign to remove the Navarra-commissioned ceramics from the market occurred as Marlborough sought to market their own vases. Navarra asserts that part of Marlborough's sales strategy was the exhibition of the vases at the Musee Guimet—the French national museum of Asian arts. Navarra alleges that the managing curator of the Musee Guimet, Jean–Paul Desroches ("Deroches"), is a frequent collaborator with Marlborough. As part of the exhibit, an "illustrated catalogue," De Neige, d'or et D'Azure ("De Neige"), authored by Deroches with photographs by Matt Aletti was produced.[3] Navarra asserts that all of the content of De Neige was provided by Marlborough and that Desroches was enlisted to "pose" as De Neige's author.

Navarra claims that, in 2009, Marlborough influenced La Martiniere, the publisher of De Neige, to issue the following statement on its website concerning Chu's history of working with ceramics: "More than 2000 paintings preceded this encounter with Sevres [the foundry where the Marlborough-commissioned ceramics were produced] and a number of even more important ink drawings, and only very rare ceramics experimentations, especially in 1998 in a fabric nearby Taipei and in 2002 in Yonne."[4] Though the statement

---

3. Defendants were permitted by the Court to file a hard-copy of 108 relevant pages of De Neige for consideration as part of their Motion to Dismiss. The Court reviewed the English portions of De Neige as a document integral to the Complaint. The English title of De Neige is Of Snow, Gold, and Sky Blue: Ceramic Works by Chu Teh–Chun.

4. Navarra asserts that this statement appeared on the publisher's website as part of an announcement of the forthcoming publication of De Neige. It appears to provide some history of Chu's work as an artist prior to the creation of the Marlborough-commissioned cases. It is undisputed that the Navarra-commissioned ceramics were not produced in either Taipei in 1998 or Yonne in 2002.

purports to quote Deroches, Navarra alleges that Marlborough actually authored the statement. Navarra argues that this statement is false, misleading, and defamatory in that it does not explicitly include the Navarra-commissioned ceramics as genuine works of art by Chu and merely describes them as "experimentations." Navarra asserts that such a statement is understood by members of the art community as a denial of the authenticity of the Navarra-commissioned ceramics. When Navarra contacted the publisher to demand a correction of the above-quoted statement on its website, the publisher informed Navarra that Marlborough "provided" all of the text for the statement on the website. The publisher represented that Marlborough had given warranties as to the accuracy of the relevant statement.

On October 22, 2009, *De Neige* was published. Navarra takes issue with the following text in *De Neige*:

> Over a thousand canvases predated Chu Teh–Chun's rendezvous with the Sevres porcelain manufactory, as did an even greater number of ink drawings and watercolors. Nevertheless, in that time he has conducted only a few experiments with ceramics, notably in a workshop outside of Taipei in 1998 and in another in Treigny, France in 2002. But these modest explorations were not pursued . . . .

Navarra claims that the above-quoted statement was ghost-written with malign intent by Marlborough, not Desroches. Navarra argues that referring to the Navarra-commission ceramics as "experimental" and "not pursued" was false, misleading, and defamatory. Navarra asserts that such a characterization is "understood among participants in the high-end art market to deny the authenticity of the works as genuine works of art." Navarra states that "[t]his overlap in strategy is simply too exact to be ignored as coincidence."

Navarra points to two other actions by Marlborough that Navarra alleges show Marlborough's intent to engage in a multistage covert campaign to destroy the goods, business, and reputation of its market competitor. Navarra asserts that Marlborough's promise that each vase would be accompanied by a "photographic" certificate of authenticity "to guaranty the work" is indicative of Marlborough's malign intent in that it implies the Navarra-commissioned ceramics are inauthentic. Finally, for the first time in their opposition papers, Navarra asserts that Chu's son, who serves as his manager, was in contact with Marlborough about the Navarra-commissioned ceramics since Fall of 2007 and that a Marlborough representative suggested Bourdon, Chu's French lawyer.

From the above events, Navarra argues that their ceramics have a false taint of inauthenticity and that the Navarra Gallery and Mr. Navarra have been held up as purveyors of fakes. Navarra claims that they lost millions of dollars in lost profits and loss of reputation, as well as harm to the public's interest in vigorous competition in the market for Chu's ceramic works of art.

## LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure "requires only a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks omitted). "In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court is required to

accept the material facts alleged in the complaint as true." *Frasier v. Gen. Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991) (citation omitted). A court is also required to read a complaint generously, drawing all reasonable inferences from its allegations in favor of the plaintiff. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). A court should not, however, credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Stephenson v. Citco Group Ltd.*, 700 F.Supp.2d 599, 619 (S.D.N.Y.2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)).

In *Twombly*, the Supreme Court held that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (internal quotation marks and citation omitted). A pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Id.* at 555 n. 3, 127 S.Ct. 1955 (alteration in original) (internal quotation marks and citation omitted). A plaintiff must, however, assert "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1940.

 Though pleading of specific evidence is not required, the plausibility standard requires "more than a sheer possibility that defendant has acted unlawfully." *Id.* at 1949. The Second Circuit has made clear that though *Iqbal* and *Twombly* do not "heighten the pleading requirements" for a plaintiff, they do "require factual amplification where needed to render a claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir.2010). Though a plaintiff may plead facts alleged upon information and belief "where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible," *Id.*, such allegations must be "accompanied by a statement of the facts upon which the belief is founded." *Prince v. Madison Square Garden*, 427 F.Supp.2d 372, 385 (S.D.N.Y.2006) (internal quotation marks and citation omitted). Legal conclusions masquerading as facts need not be accepted as true by the Court. *Twombly*, 550 U.S. at 556–57, 127 S.Ct. 1955.

## DISCUSSION

### I. Monopolization under the Sherman Act

 Navarra claims that Marlborough's course of conduct constitutes attempted monopolization in violation of § 2 of the Sherman Act.[5] To state a claim for attempted monopolization, a plaintiff must allege that a defendant "(1) engaged in anticompetitive or predatory conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 226 (2d Cir.1999).

 To state a claim under Section 1 or 2 of the Sherman Act, a plaintiff "must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized." *Kramer v.*

---

5. Section 2 of the Sherman Act prohibits: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce ...." 15 U.S.C. § 2.

Pollock–Krasner Found., *890 F.Supp. 250, 254 (S.D.N.Y.1995). "To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes . . . and it must be plausible."* Todd v. Exxon Corp., *275 F.3d 191, 200 (2d Cir.2001) (internal quotation, marks and citation omitted). Namely, this requires an "analysis of the interchangeability of use or the cross-elasticity of demand"* of the relevant products. Chapman v. N.Y. State Div. for Youth, *546 F.3d 230, 237 (2d Cir.2008). Interchangeability of use exists where "one product is roughly equivalent to another for the use to which it is put."* Id. at 238. *Cross-elasticity of demand is said to exist "if consumers would respond to a slight increase in the price of one product by switching to another product."* AD/SAT, *181 F.3d at 227. The relevant market for the purposes of antitrust litigation should include "all products reasonably interchangeable by consumers for the same purposes, because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level."* Geneva Pharma. Tech. Corp. v. Barr Labs. Inc., *386 F.3d 485, 496 (2d Cir.2004). When the plaintiff's proposed market "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."* Chapman *546 F.3d at 238 (quotation marks and citations omitted).*

 Navarra's definition of the relevant mark encompasses "the offering and sale of [Chu]'s ceramic work in New York, the United States generally, and throughout the world. (Compl. ¶ 73). In Navarra's view, this purported market contains the Navarra-commissioned, reproduced plates, the Marlborough-commissioned unique vases, as well as all other original or reproduced ceramic works by Chu. This market definition is insufficient as a matter of law as it fails the basic plausibility test under the Sherman Act.

It is undisputed that the Navarra-commissioned ceramics were not unique, original works of art: Each plate was a reproduction of a unique, original work by Chu. A total of 960 Navarra-commissioned plates were produced. The plates were sold for approximately $2,100 each. The Navarra-commissioned plates were not hand painted by Chu. The exemplars upon which the reproductions were based were to remain the property of Chu. Further, in the "Protection" provision of the Fabrication Agreement between Chu and Navarra, "unique original pieces" are explicitly "not affected by the [Fabrication Agreement]." Navarra's "Protection" in the Fabrication Agreement was only limited to the "production of multiple copy runs of ceramic works." (*See* Fabrication Agreement, Lipman Dec. Ex. B.)

By contrast, the 57 Marlborough-commissioned vases were original, unique works of art that retailed for approximately $280,000 each. Each of the vases was hand-painted by Chu, and the collection of vases merited its own three month show at the Musee Guimet.

 In light of these facts, the Court finds that the alleged market is not plausible. The Navarra-commissioned plates are not "reasonably interchangeable" with the Marlborough-commissioned vases. Reasonable interchangeability requires that "product is roughly equivalent to another for the use to which it is put." *Chapman,* 546 F.3d at 238. Simply put, the Navarra-commissioned plates are not unique objects of art. They are replicas of original works by Chu. Indeed, in light of the exemption of original pieces from the Chu–Navarra Fabrication Agreement, Navarra itself apparently did not view Chu's

original ceramics as a significant source of competition for the Navarra-commissioned reproduced plates. Navarra has not offered any theoretically reasonable explanation for restricting the product market to a particular medium—any ceramics containing a Chu design—regardless of whether they contain a unique, original design. It is implausible to include these replicas in the same antitrust market as the original, hand-painted vases simply because they utilize the same medium and contain the same artist's design.

With regard to cross-elasticity of demand, it is also implausible to suggest that a slight increase in the price of original, hand-painted Chu vases, that cost approximately 140 times the cost of the reproduced plates, would cause would-be buyers of the vases to "switch" to buying one of the 960 ceramic plates instead. *See United States v. VISA U.S.A. Inc.,* 163 F.Supp.2d 322, 335 (S.D.N.Y.2001), *aff'd,* 344 F.3d 229 (2d Cir.2003). If a hypothetical bona fide prospective purchaser of a $280,000 Chu vase considered a 5% increase in the price to be too expensive, she would be much more likely to purchase some other, comparable unique, original work of art as a next-best purchase. *See Id.* While original works of a particular artist may constitute a cognizable market for the purposes of the Sherman Act, *see Vitale v. Marlborough Gallery,* No. 93 Civ. 6276, 1994 WL 654494, at *3–*4 (S.D.N.Y. July 5, 1994), an antitrust market for Chu original and replica ceramics is not plausible as a matter of law.

Even assuming the plausibility of Navarra's alleged antitrust market, Navarra has failed to sufficiently plead their antitrust allegations. Navarra alleges a conspiracy involving Chu, his attorney, and the Marlborough Gallery to artificially restrict competition in the market for Chu ceramics. However, Navarra has not alleged facts indicative of anticompetitive conduct by Marlborough with a specific intent to monopolize and a dangerous probability of achieving monopoly power in violation of § 2 of the Sherman Act. Plaintiff's Complaint contains virtually none of the non-speculative allegations that have made other restraint of trade claims viable. *See Simon–Whelan v. The Andy Warhol Foundation for the Visual Arts, Inc.,* No. 07 Civ 6423, 2009 WL 1457177, at *5 (S.D.N.Y. May 26, 2009) (citing specific anti-competitive policies and acts of Andy Warhol Authentication Board).

Taking all of the allegations in the Complaint as true, Navarra fails to identify a single predatory or anticompetitive act by Marlborough. Rather, Navarra's allegations describe the acts of Chu, his attorney, or Deroches. Navarra relies on the assertion that Marlborough was somehow behind the acts of Chu, his attorney, and Deroches. This assertion is too speculative and conclusory to survive a motion to dismiss. There is no evidence beyond abject speculation that Marlborough committed any wrongdoing. Such guesswork is insufficient to state a claim. As in *Twombly,* where the Court found that the actions described in the complaint were "doctrinally consistent with lawful conduct," Marlborough's relationship to Chu is just as consistent with an alternative, lawful explanation of events—that Chu, at odds with Navarra, was naturally attracted to a new, high-profile opportunity. Because Plaintiff does not submit sufficient factual allegations "to raise a right to relief above the speculative level," *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, the Sherman Act claim is dismissed.

## II. *False Advertising and Trade Disparagement under the Lanham Act.*

Navarra claims Marlborough's course of conduct is also in violation of

the Lanham Act.[6] The Lanham Act makes actionable "false or misleading descriptions or false or misleading representations of fact made about one's own or another's goods or services" in "commercial advertising or promotion." *See S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir.2001) (citation omitted). For a statement to constitute "commercial advertising or promotion," as that phrase is used in the Lanham Act, the statement must be: (1) commercial speech; (2) intended to influence consumers to buy defendant's goods or services; and (3) disseminated sufficiently to the relevant purchasing public. *Boule v. Hutton*, 328 F.3d 84 (2d Cir.2003). "Commercial speech" is defined as "speech which does no more than propose a commercial transaction." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (internal quotation marks and citation omitted).

■ Navarra has not pleaded a violation of the Lanham Act as it has not alleged any false statements "in commercial advertising or promotion." Navarra points to (1) the description of the pre-Marlborough-commissioned ceramics as "experiments" and "modest explorations [which] were not pursued" in *De Neige*, and (2) the announcement of *De Neige* on the publisher's website.

■ This single paragraph in *De Neige* is from a book, by Deroches, that provides a detailed history of the development of Chu's artwork as well as a detailed description of the creation of the Marlborough-commissioned vases. The Second Circuit has held that "[s]ubjective claims about products, which cannot be proven either true or false, are not actionable under the Lanham Act." *Lipton v. The Nature Co.*, 71 F.3d 464, 474 (2d Cir.1995). The First Amendment generally immunizes such statements of opinion from liability. *See Gmurzynska v. Hutton*, 355 F.3d 206, 211 (2d Cir.2004) ("As always with public expression of opinion, we have been careful not to permit overextension of the Lanham Act to intrude on First Amendment Values."). Deroches's description of Chu's previous ceramic work as a "modest exploration[ ]" merely places the works within the context of Chu's career as an artist. This clearly constitutes the opinion of the author and is not actionable. Even if solicited by Marlborough, Deroches's statements in *De Neige* and as quoted on the publisher's website constitute mere expressions of non-actionable opinion, not misrepresentations of fact. *See Id.* at 210 (holding that museum exhibition catalogue is not commercial advertising or promotion for gallery).

Further, the statements by Deroches are those of a disinterested third party. Plaintiffs do not allege that Deroches has any financial interest in the sale of the Chu vases. Navarra's speculation that Marlborough ghost-wrote *De Neige* constitutes abject speculation. It is implausible that the managing curator of the Musee Guimet would lend his name to a publication in order to insert a vague reference that arguably diminishes the Navarra-commissioned ceramics. As noted above, Navarra

6. The Lanham Act provides, in relevant part:
 Any person who, on or in connection with any goods or services, ... uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which—[...]
 (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
 shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
 15 U.S.C. § 1125(a)(1)

has offered no more than conclusory, general allegations that Marlborough engaged in a conspiracy. Thus, such claims must be dismissed. *See Gmurzynska,* 355 F.3d at 211.

### III. *Plaintiff's State Law Claims*

Navarra's state law claims suffer from the same fundamental defect as their federal claims: Navarra has failed to plead any statements by Marlborough that are false or to allege any other wrongdoing by Marlborough.

To support Navarra's claims for defamation/libel per se, common law product disparagement/injurious falsehood, as well as conspiracy and aiding and abetting in connection with the same, Navarra relies on the statement made on the publisher's website, the statement in *De Neige,* the Christie's Hong Kong e-mail, and the advertisement in the Journal des Arts. Marlborough bases its tortuous interference allegation on the Christie's Hong Kong e-mail alone.

██ It is axiomatic that without an allegation of a false and defamatory statement a plaintiff cannot establish a cause of action for defamation. As noted above, Navarra cannot offer more than speculation that any of these statements or actions are attributable to Marlborough. Nonetheless, all of the statements that Navarra attempts to attribute to Marlborough are either non-actionable expression of opinion, as in the case of Deroches, or arguably privileged statements made in contemplation of or during the French legal proceedings, as in the case of Chu's attorney's letters.

██ Similarly, in order to sustain a tortious interference with contract claim, civil conspiracy claim, or an aiding and abetting claim, a plaintiff must plead an underlying tort. Navarra has not done so here: Navarra has not alleged any wrongdoing by Marlborough that rises above speculation. As such, the Court need not address whether Navarra has sufficiently plead special damages or malice as required by New York law for a claim of injurious falsehood and common law product disparagement.

██ Finally, Navarra's unjust enrichment claim must also fail as Navarra does not plead that Marlborough has received money or a benefit at their expense and that equity and good conscience require restitution, as required by New York law. *See Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000).

### IV. *Attorneys' Fees*

██ Marlborough also moves for attorneys' fees arising from its defense of this action. In "exceptional cases" a court may award reasonable attorney fees to the prevailing party under the Lanham Act. 15 U.S.C. § 1117. The Court does not find such "exceptional circumstances" present to support an award of attorneys' fees. As such, the Court declines to award Marlborough its attorneys' fees arising from this action.

### CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is GRANTED and Defendant's Motion for Attorneys' Fees is DENIED.

**SO ORDERED:**