**E&L CONSULTING, LTD. d/b/a C.B.C. Lumber, Co. and C.B.C. Wood Products, Plaintiffs,**

v.

**DOMAN INDUSTRIES LTD., Eacom Timber Sales Ltd., and Sherwood Lumber Corp., Defendants.**

No. CIV.A. CV040594DGT.

United States District Court, E.D. New York.

March 14, 2005.

Christopher E. Murray, Garden City, NY, for Plaintiffs.

Kelly M. Hnatt, Willkie Farr & Gallagher LLP, New York, NY, Thomas J. McNamara, Certilman, Balin, Adler & Hyman, LLP, East Meadow, NY, for Defendants.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

E&L Consulting, Ltd. d/b/a C.B.C. Lumber, Co. ("E&L") and C.B.C. Wood Products, Inc. ("CBC") (collectively, "plaintiffs") bring this action against Doman Industries Ltd., Eacom Timber Sales Ltd. and Sherwood Lumber Corp. (collectively, "defendants"). Plaintiffs allege violations of antitrust statutes (both federal and state), breach of contract and tortious interference with contract. Presently presented are defendants' motions to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim.

### Background

The following facts are taken from plaintiffs' amended complaint and are presumed to be true for purposes of these motions to dismiss. Plaintiffs are New York corporations that sell either lumber or finished-wood products in New York, New Jersey and Pennsylvania. Amended Complaint ("Am. Cplt.") ¶¶ 3, 4. E&L sells lumber; CBC sells finished-wood products. Doman Industries Limited ("Doman") and its wholly owned subsidiary, Eacom Timber Sales Ltd. ("Eacom") (collectively with Doman, "the Doman defendants"), are Canadian corporations with offices in British Columbia engaged in selling lumber products in, *inter alia*, New York, New Jersey, Connecticut, Rhode Island, Maryland, Delaware and Pennsylvania (collectively, the

"Northeastern United States"). Am. Cplt. ¶¶ 5, 6; Memorandum of Law of Doman Industries and Eacon Timber Sales In Support of Their Motion to Dismiss the Amended Complaint ("Doman Br.") at 2. Defendant Sherwood Lumber Corp. ("Sherwood"), a New York corporation, sells both lumber and finished-wood products in the Northeastern United States. Am. Cplt. ¶ 7. As a seller and importer of lumber and finished-wood products, Sherwood competes with both E&L (in the sale of lumber) and CBC (in the sale of finished-wood products).

The instant dispute arises out of a contractual agreement between E&L and the Doman defendants. Beginning in 1990, Doman (and, later, Eacom) began to provide E&L with "green hem-fir" lumber, an inexpensive (or, as plaintiffs allege, formerly inexpensive), durable product used for home-building. Am. Cplt. ¶¶ 9, 10. Plaintiffs allege that green hem-fir lumber is a unique natural resource lacking in substitutes, Am. Cplt. ¶¶ 10, 23, and that the Doman defendants "suppl[y] over 95 percent of the green hem-fir lumber available for sale in [the Northeastern United States]." Am. Cplt. ¶ 11.

Under the parties' agreement, E&L would take delivery (but not ownership) of green hem-fir lumber and sell the product on the Doman defendants' behalf to E&L's customers in New York, New Jersey and Pennsylvania, Am. Cplt. ¶¶ 8, 12, for which E&L would receive set monthly payments and a commission. Am. Cplt. ¶ 12. This agreement was memorialized in a three-year contract that took effect on January 1, 2003.[1] Am. Cplt. ¶¶ 13, 14. Among its

**1.** Plaintiffs allege "on information and belief" that the Doman defendants entered into similar arrangements with Atlantic Coast Lumber Co. and Futter Lumber, *see* Am. Cplt. ¶ 15, distributors not parties to this litigation. Defendants argue that such allegations on information and belief are insufficient as a matter of law. *See* Doman Br. at 13 & n. 8. However, courts have routinely considered claims made on information and belief. *Langadinos v. American Airlines, Inc.,* 199 F.3d 68, 73 (1st Cir.2000) ("a plaintiff can make allegations

provisions, the contract required 90 days' notice prior to cancellation. Am. Cplt. ¶ 14.

According to plaintiffs, Sherwood approached E & L about a merger in 1998. When negotiations were unsuccessful, plaintiffs allege that Sherwood and the Doman defendants conspired to "beg[i]n a process to monopolize the green hem-fir lumber market, as well as the finished-wood product market, in the United States." Am. Cplt. ¶ 18. According to plaintiffs, this monopolization scheme involved decisions by the Doman defendants to (1) provide Sherwood with favorable price schedules so that it could sell green hem-fir lumber more cheaply than E&L; (2) cancel contracts with all distributors operating in the Northeastern United States so that Sherwood could operate out of the ports formerly used by these other distributors; (3) make Sherwood the sole distributor of green hem-fir lumber in the Northeastern United States; (4) block plaintiffs' access to substitute products by reserving all available cargo shipping mechanisms that could carry alternative sources of green hem-fir lumber to the Northeastern United States; (5) allow Sherwood to raise the price of green hem-fir lumber; and (6) allow Sherwood to tie the sale of green hem-fir lumber to the sale of other finished-wood products. Am. Cplt. ¶¶ 19–28, 33–35. Plaintiffs allege that this conspiracy caused end-users of

lumber and finished-wood products to pay artificially inflated prices. Am. Cplt. ¶ 39.

Plaintiffs allege that, on January 30, 2004, the Doman defendants, citing an unspecified breach by E&L, terminated the contract without providing the required 90 days' notice. Am. Cplt. ¶ 25. The Doman defendants then sent a letter to E&L's customers informing them "that effective immediately Sherwood would be the exclusive distributor" of its products in the Northeastern United States. Am. Cplt. ¶ 27.[2]

Plaintiffs allege that after the Doman defendants cancelled their contract with E & L, Sherwood raised the price of green hem-fir lumber by somewhere between 20 and 50 percent. See Am. Cplt. ¶ 36 ("the price of green hem-fir lumber was raised by Sherwood in many cases by over 20 percent"); Affidavit of Robert Cook dated July 6, 2004 ("Cook Aff.") ¶ 2 ("Sherwood's recent price information demonstrates that the price of green hem-fir lumber has increased by over 50 percent since E&L was prohibited from purchasing green hem-fir lumber from Doman.").

Plaintiffs further allege that they have been unable to procure green hem-fir lumber from other domestic suppliers or from Canada. As far as the Canadian suppliers are concerned, plaintiffs allege that defendants have stymied efforts to obtain green hem-fir lumber from Canada by reserving all potential cargo space on the sole ship-

either on the basis of personal knowledge or on 'information and belief' "); see also Perington Wholesale, Inc. v. Burger King Corp., 631 F.2d 1369, 1372 (10th Cir.1979); Carroll v. Morrison Hotel Corp., 149 F.2d 404, 406 (7th Cir.1945).

**2.** Plaintiffs allege that at the time of termination, E & L was planning to take delivery of 10,000,000 board feet of Doman lumber (presumably green hem-fir lumber) in Red Hook, New York, and that another shipment of

6,000,000 feet of lumber was expected to arrive in February 2004. Plaintiff initially sought a temporary restraining order, which was denied on February 17, 2004. See Dkt. No. 2. During the February 17, 2004, proceedings, the court set a preliminary injunction hearing for March 11, 2004. In a letter dated February 23, 2004, plaintiffs withdrew their motion for a preliminary injunction. See letter from E. Christopher Murray, dated February 23, 2004.

ping carrier permitted to transport green hem-fir lumber from Canada to New York, Saga Forest Carriers. Am. Cplt. ¶¶ 33–35; Cook Aff. ¶ 3. As far as domestic lumber is concerned, the only company other than Doman that supplies green hem-fir lumber—TimberWest—has an extremely small inventory, which must be shipped by rail, a form of transport that is ten percent more expensive. Am. Cplt. ¶¶ 29–30. Plaintiffs do not allege that defendants are impeding customers' efforts to import TiberWest lumber by rail; consequently, TimberWest appears to be a viable, if slightly more expensive, alternative.[3]

Plaintiffs also state that the only other substitutes for green hem-fir lumber—Douglas Fir and KD Hem Fir—cost 25 percent more and that "the price elasticity of lumber precludes these products from being adequate substitutes for green hem-fir lumber." Am. Cplt. ¶¶ 31, 32. In any event, plaintiffs claim that any seemingly comparable products to green hem-fir lumber "are not adequate for use when the lumber will be exposed to the elements for a long time such as being utilized to frame houses." Am. Cplt. ¶ 32. In short, plaintiffs imply that green hem-fir lumber is a one-of-a-kind resource.

Plaintiffs allege violations of state and federal antitrust statutes; namely, conspiracy and restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1; monopolization in violation of the Sherman Act, 15 U.S.C. § 2; use of market power to pre-vent competitors from utilizing transportation systems in violation of 15 U.S.C. § 18; unlawful tying in violation of the Sherman Act; and unlawful tying in violation of the Robinson Patman Act, 15 U.S.C. § 13. Plaintiffs also bring claims under state law for violations of the Donnelly Act, N.Y. Gen. Bus. Law § 340; breach of contract by the Doman defendants and tortious interference with a contract by Sherwood.

Defendants move to dismiss the amended complaint for failure to allege a relevant geographic or product market; failure to adequately allege antitrust injury or standing; failure to state a claim under Section 1 of the Sherman Act; failure to state a claim under Section 2 of the Sherman Act; failure to plead the necessary elements of a violation under Section 7 of the Clayton Act; failure to plead the necessary elements of a tying claim; failure to plead the necessary elements of a Robinson–Patman Act violation; failure to state a claim for a violation of the Donnelly Act; failure to plead the necessary elements of a breach-of-contract claim (this claim is brought only against the Doman defendants); and failure to state a claim for tortious interference with a contract (this claim is brought against Sherwood).

On November 7, 2002, Doman entered into bankruptcy proceedings pursuant to the Companies' Creditors Arrangement Act ("CCRA"). On December 6, 2002, the Supreme Court of British Columbia or-

---

**3.** However, an affidavit by Mr. Cook (president of both E&L and CBC) does contain an additional detail suggesting that defendants do somehow control the shipment of green hem-fir lumber by rail. According to Mr. Cook, "Doman is now charging $60 to $80 per MBF greater for any lumber that is transported by rail, as opposed to by ship. Thus, green hem-fir lumber that is transported by rail is at least 20 to 30 percent more expensive than green hem-fir lumber that is transported by ship." Cook Aff. ¶ 3. This state-ment implies that the price of lumber shipped by rail is controlled by the Doman defendants rather than the result of increased costs due to the use of rail transportation. However, read as implied, the statement contradicts the amended complaint when discussing TimberWest lumber. See Am. Cplt. ¶ 29 ("the only way for Timber West [sic] to deliver green hem-fir lumber is by rail, which increases the cost of green hem-fir lumber by more than 10 percent ... [and] is thus not a comparative or substitute product").

dered that "no suit ... or proceeding of any other nature ... shall be proceeded with or commenced against any of the Petitioners." Affidavit of Kelly M. Hnatt dated June 7, 2004 ("Hnatt Aff.") Ex. 2 ¶ 4(c); Doman Br. at 3. Doman argues that all claims against it must be dismissed under principles of comity.

### Discussion

#### (1)

#### Comity

■ Comity is "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot,* 159 U.S. 113, 159, 16 S.Ct. 139, 40 L.Ed. 95 (1895). This is especially the case for bankruptcy proceedings: "American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities." *Cunard S.S. Co. v. Salen Reefer Services AB,* 773 F.2d 452, 458 (2d Cir. 1985). *See also Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 999 (2d Cir.1993), *cert. denied,* 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993) ("[W]e have recognized that comity is particularly appropriate where, as here, the court is confronted with foreign bankruptcy proceedings.").

■ "Comity will be granted to the decision or judgment of a foreign court if it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violat-

ed." *Cunard,* 773 F.2d at 457 (citing cases). This certainly holds true for "Canada, a sister common law jurisdiction with procedures akin to our own." *Clarkson Co. v. Shaheen,* 544 F.2d 624, 630 (2d Cir.1976). As Judge Batts noted in *Tradewell, Inc. v. American Sensors Electronics,* 1997 WL 423075 (S.D.N.Y. July 29, 1997), Canada's bankruptcy procedure under the CCRA satisfies the standards of procedural fairness established under the law of this circuit. *See id.* at *2—*3 (citing *Allstate,* 994 F.2d at 999).[4]

As a preliminary matter, plaintiffs do not argue that they will be materially disadvantaged by the Canadian proceedings. Instead, they assert that comity does not apply in this case because the antitrust allegations at bar "could not be enforced in the Canadian bankruptcy proceeding." Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Plaintiff Br.") at 8. Plaintiffs apparently believe that the antitrust issues they raise cannot adequately be resolved under the CCRA proceeding. But plaintiffs proffer no evidence why the Canadian courts are ill-equipped to apply U.S. antitrust law. They cite no case law or provision of the CCRA that would preclude them from asserting such a claim. Also, as noted by defendants, U.S. courts have accorded comity to foreign bankruptcy proceedings in other cases raising purportedly "unique" federal causes of action. The *Allstate* court affirmed a trial judge's decision to dismiss a case alleging claims under the federal securities laws in light of the pendency of Australian bankruptcy proceedings. 994 F.2d at 998–1000. That court also approvingly cited a bankruptcy judge's decision dismissing a securities ac-

---

4. It should be noted that this circuit does not require that foreign "liquidation proceedings be identical to United States bankruptcy proceedings." *Allstate,* 994 F.2d at 999; *see also*

*In re Brierley,* 145 B.R. 151, 166 (Bankr. S.D.N.Y.1992) ("[n]othing dictates that the foreign law be a carbon copy of our law").

tion in favor of an English bankruptcy proceeding in *Lindner Fund, Inc. v. Polly Peck Int'l PLC*, 143 B.R. 807, 810 (Bankr. S.D.N.Y.1992). And, in *Tradewell*, the court invoked comity to stay a breach-of-contract claim. 1997 WL 423075, *supra*. These decisions foreclose plaintiffs' argument that comity does not apply because they "are not simply creditors of the defendants." *See* Pl. Br. at 8.[5]

According to defendants, plaintiffs "are clearly identified as potential creditors in Doman's Canadian bankruptcy proceeding." Doman Br. at 6. In that regard, defendants provide a list of potential creditors, all of whom received copies of claim forms. That list includes CBC. *See* Hnatt Aff. Ex. 3 (Affidavit of Kibben Jackson dated May 28, 2004, Ex. A). Plaintiffs do not allege lack of notice of the bankruptcy proceedings, and they do not dispute defendants' argument that plaintiffs received notification.

Extending comity to the Canadian proceeding does not "frustrate an important public policy of the United States," Pl. Br. at 11. Plaintiffs can assuredly ask the Canadian tribunal to apply either foreign law, something U.S. courts do all the time, *see* Fed.R.Civ.P. 44.1, or Canada's own Federal Competition Act, Canada's equivalent statute. *See* R.S.C. 1985, c.C–34. In sum, plaintiffs have demonstrated neither prejudicial result from staying proceedings against Doman nor any other convincing reason why the general presumption favoring comity should be disturbed. Were this court to have jurisdiction over the federal antitrust allegations, it would send all

claims against the Doman defendants (both federal and state) to Canada, where the bankruptcy proceedings are already underway.

Nevertheless, the Doman defendants' arguments regarding comity have no impact on the numerous antitrust allegations also asserted against Sherwood. In order to avoid unnecessary duplicative litigation and, as explained *infra*, because all of plaintiffs' antitrust allegations are insufficient to state a claim as a matter of law, the antitrust claims against both defendants will be resolved on substantive (antitrust) rather than procedural (comity) grounds.[6]

### (2)

### The Alleged Antitrust Violations

Defendants argue, first, that plaintiffs' allegations do not state a claim under antitrust laws because they fail to allege and define the product market. Defendants further argue that, in any event, these allegations do not make out an injury under the antitrust laws.

### (a)

### Relevant Market

■ A relevant market is comprised of a geographic market and a relevant product market. "The 'geographic market' is simply the geographic area where the competition occurs." *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 142 F.Supp.2d 296, 303 (E.D.N.Y.2001), *aff'd*, 35 Fed.Appx. 29 (2d Cir.2002) (citing *North Jersey Secre-*

---

**5.** Plaintiffs also argue that "[t]he Canadian Bankruptcy Court does not have jurisdiction ... to adjudicate claims involving conduct within the United States." Plaintiff Br. at 10. But plaintiffs fail to show why that is the case. Plaintiffs also try to analogize this case to various exceptions to the automatic stay provisions enshrined in the U.S. Bankruptcy law,

*see* Pl. Br. at 11 (citing 11 U.S.C. § 362(b)(1) and (4)), but those provisions only exempt criminal and government suits, not private civil suits.

**6.** As explained *infra*, any remaining state law claims against the Doman defendants would have to be brought in Canada.

*tarial School v. McKiernan,* 713 F.Supp. 577, 583 (S.D.N.Y.1989)). Plaintiffs' allegation that the geographic market consists of the Northeastern United States is sufficient for purposes of this motion. *Id.*

■ With respect to product market, "[i]f a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand . . . a court may grant a Rule 12(b)(6) motion." *Id.* Although "[e]xtensive analyses of reasonable interchangeability and cross elasticity of demand . . . are not required at the pleading stage," *Envirosource, Inc. v. Horsehead Resource Dev. Co.,* 1997 WL 525403 * 3 (S.D.N.Y. Aug. 21, 1997), "an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes— analysis of the interchangeability of use or the cross-elasticity of demand—and it must be plausible." *Todd v. Exxon Corp.,* 275 F.3d 191, 200 (2d Cir.2001) (internal citations and quotation marks omitted).

■ Defendants argue that plaintiffs refer to several different markets without adequately identifying "the supposed relevant market upon which plaintiffs rely in connection with their antitrust claims." Doman Br. at 11. That is not the case. Plaintiffs allege a monopoly involving "a specific natural resource—green hem-firm lumber" and unlawful tying of green hem-fir lumber with market of finished-wood products. Pl. Br. at 11–12. Defendants also argue, more persuasively, that the amended complaint fails to plead a relevant market in economically meaningful terms by failing to allege any facts regarding the "product[s] a customer will (or will not) switch in response to a supposed price increase in green hem-fir." Doman Br. at 11 (citing *Discon Inc. v. NYNEX Corp.,* 86 F.Supp.2d 154, 160 (W.D.N.Y.2000)). That claim more adequately captures the deficiency in plaintiffs' complaint. As an initial matter, plaintiffs fail to cite a single case or other precedent supporting the market definition advanced in their pleadings. Moreover, and more seriously, plaintiffs' allegations regarding the product market are contradicted by other facts set forth in their own complaint.

Plaintiffs allege that defendant Sherwood has raised the price of green hem-fir lumber at least by 20 percent (according to the amended complaint, *see* Am. Cplt. ¶ 36), and perhaps by as much as 50 percent (*see* Cook Aff. ¶ 2). At the same time, plaintiffs allege that green hem-fir lumber shipped by rail, or substitute products like Douglas Fir and KD Hem Fir, cost between 10 and 25 percent more than green hem-fir lumber. Am. Cplt. ¶¶ 29–32.

Plaintiffs nowhere allege, much less demonstrate, how the price increases would exclude competitors who sell close substitutes, like green hem-fir lumber shipped by rail, Douglas Fir or KD Hem Fir. Moreover, their own allegations regarding the paucity of suppliers of green hem-fir lumber outside the Northeastern United States (they allege that there is the only one such supplier) suggest that green hem-fir lumber is not the unique product they claim it to be.

Even if the dramatic price increases wrought by Sherwood had a detrimental impact on market-wide competition for green hem-fir lumber within the Northeastern United States, the cost increase associated with that monopoly would render the alternate sorts of lumber more competitive, eventually driving out all business for green hem-fir lumber. Under the circumstances alleged in plaintiffs' complaint, Sherwood would have effectively

priced itself out of the market.[7] Because plaintiffs do not allege a lack of supply of these alternative sources of wood, there is no reason why purchasers of green hem-fir will not chose substitute lumber to fill their demand. In short, there appear to "be other avenues available to competing manufacturers to distribute their product." *Anheuser–Busch, Inc. v. G.T. Britts Distributing, Inc.*, 44 F.Supp.2d 172, 176 (N.D.N.Y.1999).

Plaintiffs rest on the allegations in their amended complaint (and appear to add at least one new fact),[8] asserting that they adequately "define a geographical market for a unique natural resource which give rise to the claims of anti-competitive conduct by the defendants." Pl. Br. at 13. Missing from this analysis is any discussion, in "economically meaningful terms," *Discon*, 86 F.Supp.2d at 160, *supra*, of " 'cross-elasticity of demand between the product itself and substitutes for it.' " *Pepsico, Inc. v. Coca–Cola Co.*, 1998 WL 547088, *5 (S.D.N.Y. Aug. 27, 1998) (citing *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502). Plaintiffs do not adequately explain how the market for this "unique natural resource," *i.e.*, green hem-fir lumber "is so wholly segmented from the available substitutes that a rise in [its] price would not shift demand to some of the alternatives." *Carell v. Shubert Organization, Inc.*, 104 F.Supp.2d 236, 266 (S.D.N.Y.2000).

Furthermore, there is an additional reason why defendants' alleged 95 percent ownership of the green hem-fir lumber market within the Northeastern United States would not translate into monopoly power. According to plaintiffs' complaint, TimberWest is the only alternate supplier of green hem-fir lumber, and its own inventory is "extremely small" compared to Sherwood. *See* Am. Cplt. ¶¶ 29–30. Assuming the truth of those facts, there would appear to be a serious shortage of green hem-fir lumber for the construction of homes outside the Northeastern United States. And yet, home-builders outside that region (including, of course, states bordering the Northeastern states, where temperature and climates are similar) seem able to obtain sufficient materials to perform their work. End-users in these areas obviously use something for home-building, and whatever these substitute products might be—perhaps they are Douglas Fir or KD Hem Fir, green hem-fir lumber delivered by rail, or another product[9]—plaintiffs' complaint does not even attempt to explain why these products are not appropriate for end-users within the Northeastern United States. Putting aside the possibility that a limited supply of green hem-fir lumber requires end-users outside the Northeastern United States to resort to the world of the second-best (something plaintiffs do not maintain), plaintiffs' definition of the market appears to leave out viable substitutes used in the construction of homes in other parts of the country. Under the circumstances, and as a matter of common sense, plaintiffs have not considered the realm of "substitute products ... or distinguish[ed] among apparently comparable products or ... allege other pertinent facts related to cross-elasticity of demand." *Beyer Farms*, 142

---

7. Accordingly, plaintiffs' tying claim would also fail. Once Sherwood's dominance over the green hem-fir lumber were disrupted by competitors, Sherwood would have no power to illegally tie the sale of green hem-fir lumber to its finished-wood products.

8. *See* Pl. Br. at 13 (noting "the ability of this product [green hem-fir lumber] to grow naturally in great quantities in certain terrain").

9. Indeed, during oral argument, counsel for plaintiffs opined that end-users in such areas likely use green hem-fir lumber as well.

F.Supp.2d at 303 (internal quotation marks omitted).

### (b)

### Antitrust Injury and Standing

■ Nonetheless, assuming, *arguendo,* that plaintiffs have adequately alleged a viable product market—green hem-fir lumber within the Northeastern United States—they must still allege antitrust injury and demonstrate standing to sue. In doing so, plaintiffs must show more than mere injury to their own interests. They must allege *"antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). *See also Balaklaw v. Lovell,* 14 F.3d 793, 797 (2d Cir.1994) ("It is now well settled that in order to have standing to prosecute private antitrust claims, plaintiffs must show more than that the defendants' conduct caused them an injury."). Plaintiffs must allege harm to the general market that has, in turn, harmed their own interests.

■ First, it must be noted that the type of exclusive distributorship alleged here does not, standing alone, demonstrate antitrust injury. On the contrary, "exclusive distributorship arrangements are presumptively legal." *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.,* 129 F.3d 240, 245 (2d Cir.1997); *see also United States v. Visa U.S.A., Inc.,* 344 F.3d 229, 241 (2d Cir.2003); *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 131 (2d Cir.1978) (en banc).[10] As the Second Circuit noted in *Electronics Communications,* "[m]anufacturers must enjoy some freedom to determine how to distribute their products without subjecting themselves to attack under the antitrust laws by disappointed distributors, absent activity that is manifestly anticompetitive." 129 F.3d at 245–46.

■ "For an exclusive dealership arrangement to cause a harm to competition (and overcome the presumption of legality), it must prevent *competitors* from getting their products to consumers at all." *Visa,* 344 F.3d at 242 (emphasis added). In this case, E&L has no product to bring to market, and neither it nor any other supposed competitor is prevented from reaching customers as a result of defendants' conduct.[11] This case, instead, "is essentially a dispute about the way one product is distributed, a question of intrabrand competition." *Electronics Communications Corp.,* 129 F.3d at 244. Absent allegations of horizontal price-fixing—and there are none here—there is nothing actionable in the selection of Sherwood as exclusive distributor. *Id.* at 243. In fact, this circuit has specifically noted certain

---

**10.** As the Fifth Circuit has stated: "Lest any other former distributors succumb to the temptation of treble damages, we reiterate that it is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business." *Burdett Sound, Inc. v. Altec Corp.,* 515 F.2d 1245, 1249 (5th Cir.1975).

**11.** Plaintiffs' allegation that E&L was denied the opportunity to purchase green hem-fir lumber outright (as opposed to simply distributing the lumber), *see* Pl. Br. at 14; Am. Cplt. ¶ 24, does not change the analysis. For antitrust purposes, there is no allegation of a competitor unable to bring its product to market as a result of defendants' conduct.

*advantages* of vertical restrictions, which "promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products." *Oreck*, 579 F.2d at 131.

Noting that "exclusive sale agreements, absent a purpose to set prices, are determined under the rule of reason," Pl. Br. at 15, plaintiffs seek "an examination to see if the exclusive agreement has a reasonable main purpose." *Id.* at 16. But given the presumption, explained *supra*, of the validity of exclusive distributor agreements, plaintiffs must allege some reason why this examination is warranted based on a theory antitrust liability. Instead of doing so, they simply argue, repeatedly, that "this exclusive agreement was entered into to artificially inflate the price that the distributor ... could charge at the resale level." Pl. Br. at 17. *See also id.* at 1–2 (alleging defendants' monopolization and restraint of trade "to maintain an artificially high price structure"); *id.* at 7 (alleging use of monopoly power to "rapidly increase prices"). But this is not a theory of anti-trust liability. Plaintiffs must allege some type of harm to competition market-wide. As far as the increase in the price of green hem-fir lumber is concerned, the Doman defendants, to the extent that they enjoy a natural monopoly over the sale of green hem-fir lumber, could conceivably raise prices without enlisting Sherwood. And, in any event, such a monopoly does not violate antitrust laws. *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1024 (10th Cir.1992) ("a company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product"); *see also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 393, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (Although "one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product ... this ... is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product").

Plaintiffs rely on dicta in numerous circuit court cases for a host of rather unremarkable observations. For example, they cite *Visa* to underscore that "[t]he fact that [exclusive distributor agreements] harm competitors does not, however, mean that they do not also harm competition." Pl. Br. at 18 (citing *Visa*, 344 F.3d at 243). While this premise may hold logical validity, it does not bolster plaintiffs' case unless they can actually demonstrate some type of antitrust harm, which they do not. In any event, *Visa* is inapplicable to the case at hand. *Visa* involved business arrangements by credit-card companies that unquestionably barred competing issuers of credit cards from reaching potential consumers. Indeed, the Second Circuit noted that, absent such policies, the exclusive distributor agreements would not have raised antitrust concerns. 344 F.3d at 242.

The case at bar is more akin to *Electronics Communications* and *Oreck*, both of which involved standard exclusive distributorship agreements where plaintiffs failed to allege market-wide harm that in turned caused injury to them. Although plaintiffs allege that the general market for green hem-fir lumber has been saddled with higher prices, and although E & L has obviously been harmed by the loss of its contract with the Doman defendants, plaintiffs make no allegation of a nexus between the harm plaintiffs have suffered and the supposed market-wide injury. Although plaintiffs allege that Sherwood has raised the price of green hem-fir lumber by 20 to as much as 50 percent, they do not describe any causal connection between the alleged price increase and the

alleged monopolization scheme. Their only allegation regarding market-wide harm is the vague, repeated assertion that Sherwood has raised prices, without any indication of the type of harm this has had on the market or the ability (or lack thereof) of end-users to find substitute products. This allegation fails to demonstrate any type of harm to anyone other than plaintiffs, who are understandably disgruntled by the decision by the Doman defendants to select an alternate supplier for green hem-fir lumber.

Plaintiffs' allegations suffer from additional problems as well. They offer no explanation of what possible motive the Doman defendants have for allowing Sherwood to raise its prices in such an astronomical fashion without any benefit to itself. The only plausible possibility would be a prior agreement whereby Doman would keep most, if not all, of the monopolistic profits. But plaintiffs make no allegation that the Doman defendants stood to benefit from this alleged scheme. On the contrary, they essentially argue that the Doman defendants fared *worse* under the conspiracy. After all, under the alleged scheme, it is *less* likely that end-users would continue to purchase Doman lumber through Sherwood given the astronomical price increases allegedly imposed by the new distributor.

Similarly, plaintiffs' tying argument suffers from the same deficiencies. Plaintiffs do not allege, let alone explain, how any decision on the part of Sherwood to require end-users to purchase its own finished-wood products as a condition for purchasing green hem-fir lumber would benefit the Doman defendants. Again, the alleged scheme would only frustrate the Doman defendants' interest in bringing green hem-fir lumber to market at the highest possible price that the market would permit. Furthermore, with respect to the Doman defendants, there is no allegation of "a tying and a tied product," a prerequisite to bringing such a claim. *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir.1996). In any event, it is hard to see how plaintiffs even possess standing to bring such a tying claim given that they are neither purchasers of green hem-fir lumber (having sold it on consignment) nor end-users of either green hem-fir lumber or finished-wood products.

The conclusory and, at times, implausible nature of plaintiffs allegations fail to establish any antitrust injury and are not sufficient to make out a claim under the antitrust laws, even at this early stage of the litigation.

### (3)

### The Robinson–Patman Act

■ Plaintiffs' allegation that the Doman defendants, before reneging on their contract, sold lumber to Sherwood at prices lower than those they charged plaintiffs fails as well. It is dubious whether the Act even applies to claimants like plaintiffs, mere sales agents who never took ownership or control of the lumber in question. *See National Auto Brokers Corp. v. G.M. Corp.*, 376 F.Supp. 620, 626 (S.D.N.Y.1974), *aff'd* 572 F.2d 953 (2d Cir. 1978), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979). Even if plaintiffs did have standing to bring such a claim, the overall inadequacies about the alleged monopoly scheme simply do not hold up to scrutiny. As the Supreme Court has held, "a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). Plaintiffs have not adequately alleged such an injury; consequently, this claim is denied as well.

## (4)
### State Law Claims

Having dismissed the federal questions raised by plaintiffs, this court will not exercise supplemental jurisdiction over the remaining state law claims, as those issues are more properly adjudicated by state courts. *See* 28 U.S.C.A. § 1367(c); *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 348, 351–53 & n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims"). With respect to the Doman defendants, however, for the reasons explained above, any state-law claims must be brought as part of the ongoing Canadian bankruptcy proceedings.

### Conclusion

For the foregoing reasons, defendants' motions to dismiss the amended complaint are granted. Plaintiffs' federal antitrust claims and Donnelly Act claim against both Doman and Sherwood are dismissed with prejudice. Plaintiff's remaining state law claim against Doman for breach of contract is dismissed without prejudice. Plaintiff's remaining state law claim against Sherwood for tortious interference with contract is dismissed without prejudice. The Clerk of the Court is directed to close this case.